1
2
3
4
5
6
7               UNITED STATES DISTRICT COURT

8               EASTERN DISTRICT OF WASHINGTON

9
SPOKANE SCHOOL DISTRICT NO. 81,    )
10  a Washington non-profit            )
    corporation,                       )      NO.  CV-04-0078-MWL
11                                      )
                    Plaintiff,          )
12                                      )      Findings of Fact and
        v.                              )      Conclusions of Law
13                                      )
    NORTHWEST BUILDING SYSTEMS,         )
14  INC., an Idaho corporation, and     )
    NORDYNE, INC., a Missouri           )
15  corporation,                        )
                                        )
16                  Defendants.         )

17

18       This matter came on for trial before the Court on February 21,

19  22, 23, 24, and 27, 2006.  William E. Pierson, Jr., appeared for the

20  Plaintiff.  Andrew C. Bohrnsen appeared for Defendant Northwest

21  Building Systems, Inc. ("NBS") and Steven R. Stocker appeared for

22  Defendant Nordyne, Inc. ("Nordyne").

23       Testifying in open court for Plaintiff was Ed Butterfield, Fire

24  Investigator, Ron Kilgore, Electrical Engineer, Tim Wood, Maintenance

25  Department Manager for Spokane Public Schools, Randy Lasswell,

26  Mechanical Engineer for Spokane Public Schools, Bradley Wolfrum,

27  Electrical Foreman for Spokane Public Schools, Carol Golden, a teacher

28  at the Indian Trails Elementary School, and Cindy Coleman, Director of

Accounting for Spokane Public Schools.

Findings of Fact and Conclusions of Law - 1

Testifying in open court for Defendant NBS was Ron Cooper, the owner and operator of NBS, and Randolf Harris, a Forensic Engineer.

Testifying in open court for Defendant Nordyne was Allan Reifel, the vice president of the engineering department for Nordyne.

Also testifying in open court were Michael Beraducci, an electrician for the Spokane Public Schools, Kevin Guthrie, a steam fitter for the Spokane Public Schools, and Gene Petefish, the foreman of the HVAC department for the Spokane Public Schools.

All of the exhibits admitted in evidence have been reviewed and considered by the Court, some of which are referenced below.

Having considered all of the foregoing evidence, the Court issues this Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52(a).

<u>Nature of the Proceedings and Jurisdiction</u>

This is an action for recovery of alleged damages arising out of a fire on October 20, 2001, to a modular classroom owned by the Plaintiff at the Indian Trail Elementary School, 4102 West Woodside, Spokane Washington.  Defendant NBS manufactured the modular classroom pursuant to a contract with Gelco Space (a non-party).  The unit's HVAC system was manufactured by defendant Nordyne and purchased by NBS through Wesco Distributors (a non-party).  Plaintiff has sued Defendants for damages alleged to have been caused by this fire. Plaintiff seeks an award of compensatory damages in the sum of $337,937.54 from the defendants.  In accordance with RCW 19.86.090, plaintiff also seeks an award of punitive damages, attorney fees and litigation costs for Defendants' violation of the Washington Consumer Protection Act, RCW 19.86.020.

///

Jurisdiction in this matter is conferred on the United States District Court for the Eastern District of Washington by virtue of 28 U.S.C. § 1332(a)(1).   All parties to this lawsuit are citizens of different states and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.   The parties have consented to proceed before a United States Magistrate Judge in this case.   (Ct. Rec. 10).

<u>Findings of Fact</u>

The Court makes the following findings of fact from the evidence and testimony presented at trial:

1.   In June, 1992, Spokane Public Schools entered into a construction contract with Gelco Space (now doing business as GE Modular Space) to construct eleven (11) relocatable, two-classroom units ("portables") and one relocatable, single classroom unit for installation at twelve different schools throughout the School District.   One of these portables, B-101 and B-102, was to be delivered and installed at the Indian Trail Elementary School.

2.   Gelco Space subcontracted with NBS to construct the portables contracted for by Spokane Public Schools.

3.   The construction specifications for the portables were prepared by architects for Spokane Public Schools.

4.   Gelco Space provided the approved plans and specifications for NBS to use in its construction of the portables.

5.   The specifications submitted by Gelco Space to NBS provided that the code which was required to be complied with in the manufacturing of the portables was the "Washington Gold Label," WAC

Findings of Fact and Conclusions of Law - 3

296-150F.  The Washington Gold Label consists of a phase-by-phase inspection of the portables to confirm compliance with specifications on file with the state of Washington.

6.    NBS purchased from Wesco Distributers ("Wesco") heat pumps manufactured by Nordyne to provide heating and cooling for the portables.

7.    This was the first time NBS had installed a Nordyne heat pump with a portable.  NBS had previously installed heat pumps manufactured by Bard, a competitor of Nordyne, in the portables NBS had constructed for Gelco Space.

8.    The heat pump manufactured by Nordyne for use in the portables was the model PWY-036 Wall King External Vertical Mounted Heat Pump.

9.    This Nordyne heat pump is an Underwriter Laboratories ("UL") tested and listed HVAC unit that was factory installed with 10 KW auxiliary heat capacity and is UL listed for a maximum auxiliary heat capacity of 15 KW.

10.    The industry standard calls for a one-quarter inch clearance between the heat pump and combustibles.

11.    The Nordyne heat pump installation instructions call for a one inch clearance to be provided on all four sides of the supply duct for the first three feet of the duct attached to the outlet airframe, or between the heating element portion of the heat pump and any combustible material.

///

///

Findings of Fact and Conclusions of Law - 4

12.   The 1991 edition of the Uniform Mechanical Code required that a heat pump be installed on the exterior of a portable such that a one inch clearance was maintained between the heating element portion of the heat pump and any combustible material.  The 1990 edition of the National Electrical Code required the same one inch clearance.

13.   The statute applicable to factory built commercial structures is RCW 43.22.480.

14.   Pursuant to RCW 43.22.480(1):

> The Department [of Labor & Industries] shall adopt and enforce rules that protect the health, safety and property of the people of this state by assuring that all factory built housing or factory built commercial structures are structurally sound and that the plumbing, heating, electrical and other components thereof are reasonably safe.  The rules shall be reasonably consistent with recognized and accepted principles of safety and structural soundness, and in adopting the rules **the department shall consider, *so far as practicable*, the standards and specifications contained in the uniform building, plumbing and mechanical codes**, including the barrier free code and the Washington energy code as adopted by the state building code council pursuant to Chapter 19.27A RCW, **and the national electrical code**, including the state rules as adopted pursuant to chapter 19.28 RCW and published by the national fire protection association or, when applicable, the temporary worker building code adopted under RCW 70.114A.081.

RCW 43.22.480(1) (emphasis added).

15.   Ron Cooper indicated that the Washington Gold Label standard allows for variances from the standards and specifications contained in the uniform building code and national electrical code.

16.   The Washington Gold Label standard is the adopted building code that governs the manufacturing process carried out by manufacturers of modular classrooms in the state of Washington.

///

Findings of Fact and Conclusions of Law - 5

17.   The Court finds that the testimony of Ron Cooper regarding the Washington Gold Label process is credible and persuasive.

18.   Ron Cooper stated that the design specifications that Gelco Space's engineering staff had submitted to the state of Washington for design review showed a zero clearance for the heat pump.

19.   The Washington Gold Label standard does not contain a specific requirement for a one inch clearance at any given location on the heat pump.

20.   Randolph Harris stated that, under normal operating conditions, no clearance is necessary between the heating portion of the heat pump and combustible materials.

21.   NBS used a three-eighths inch template and provided a three-eighth's inch clearance between the heating element portion of the heat pump and combustible materials as installed on the portables in 1992.

22.   A plastic sleeve containing the owner's manual, installation instructions, service manual and replacement parts list was placed in each Nordyne heat pump control box prior to the unit being packaged in its shipment container.

23.   When NBS received the Nordyne heat pumps, the heat pumps had already been removed from their shipping containers and packaging.

24.   NBS did not receive manufacturing installation instructions for the Nordyne heat pumps from Wesco.  NBS nevertheless planned to construct the portables in compliance with the plans and specifications it was provided by Gelco Space's engineering staff and in accordance with the Washington Gold Label design review process.

Findings of Fact and Conclusions of Law - 6

25.  At no time prior to installing the heat pumps did NBS contact either Wesco or the Nordyne technical service department to inquire about installation instructions.

26.  When the portables were delivered to the School District, Gelco Space submitted to the School District a binder containing all product information, installation instructions, maintenance information and warranties for all mechanical equipment contained in each portable, including the Nordyne heat pumps.

27.  Mr. Cooper's explanation of the process for obtaining the Gold Label seal indicated that state inspectors examine each phase of the construction and certify whether the unit complies with the Gold Label standard.  After the building is completed, a final inspection takes place and, if the Washington Gold Label standard has been complied with, an inspector affixes a Gold Label seal to the unit.

28.  The portable delivered to Indian Trail Elementary School had a properly issued Gold Label seal permanently affixed to its exterior.

29.  The Nordyne heat pump installed for the portable by NBS originally possessed a heating element with two five-kilowatt ("KW") heating strips supplying a total of 10 KW of heating capacity.

30.  The School District experienced a number of problems with a lack of heat in the portables built by NBS, primarily due to the inability of the heat pumps to extract enough warm air from the environment during Spokane's cold winter months.

31.  In October of 1996, Spokane Public Schools decided to add an additional 10 KW of heating capacity to all Nordyne heat pumps
///

Findings of Fact and Conclusions of Law - 7

supplied with the portables NBS delivered in 1992 in an attempt to deal with the low heat problems.

32.   Modifications were done by the School District personnel, and these modifications were not inspected or examined by an outside agency or an independent electrical engineer.

33.   Spokane Public Schools did not inform anyone from Nordyne or NBS that they added the additional 10 KW of heating capacity to the Nordyne heat pumps.

34.    The 10 KW heating banks that were installed in all of the portables in the fall of 1996 exceeded the recommended safe operating heat capacity and voided the UL rating for the Nordyne heat pumps and the certification of the modular units.

35.   The School District continued to have problems with a lack of heat over the next five years.

36.   On October 12, 2001, the School District received a report that the heat pump in Indian Trail Elementary classroom B-102 was not producing heat.

37.   Carol Golden, the teacher stationed at classroom B-102, indicated that the unit was blowing cold air.

38.   According to School District maintenance records, School District personnel performed repairs or maintenance on the heat pump each day from October 15 to October 19.

39.   There was no evidence regarding the nature of those repairs only that the repairs resulted in a restoration of heat to the classroom.

///

Findings of Fact and Conclusions of Law - 8

40.  Ms. Golden indicated that the repairs restored heat to the classroom.  Ms. Golden's testimony indicated that hot air was blowing and the fan was operating on Friday, October 19, 2001.

41.  On Friday, October 19, 2001, before leaving the classroom at the end of the day, Ms. Golden noticed that the indoor thermostat had lights illuminated indicating that the auxiliary heat and emergency heat were both on.  The inference from this testimony is that both the original heating elements and those added by the School District were operating and producing heat at that time.

42.  In the early morning hours of October 20, 2001, a fire started in the wall area next to the Nordyne heat pump at the east end of portable B-102 at the Indian Trail Elementary School.

43.  The City of Spokane Fire Department was called and the fire was extinguished later that morning.

44.  The fire caused substantial physical damage to classroom B-102 and the classroom's personal property contents.

45.  Ed Butterfield, a local fire investigator, conducted an independent investigation into the origin and cause of this fire.  Mr. Butterfield had an opportunity to examine the fire scene on October 24, 2001.

46.  Mr. Butterfield determined that the fire originated at the exterior east wall of portable B-102.  Mr. Butterfield concluded the fire was caused by the ignition of the combustible exterior siding for the portable by the Nordyne heat pump.

///

///

Findings of Fact and Conclusions of Law - 9

47.  Mr. Butterfield testified that he could not determine the amount of clearance around the entire top side of the duct because of the fire damage; however, he did observe a clearance of approximately one-half inch on the top side of the duct that remained undamaged by the fire.

48.  The Court finds Mr. Butterfield's testimony credible and persuasive.

49.  The Nordyne heat pump was removed from the fire scene and shipped to Ron Kilgore, an electrical engineer, so that Mr. Kilgore could examine the Nordyne heat pump to determine the cause of the fire at Indian Trail Elementary School.

50.  Mr. Kilgore opined that the fire was caused by the following:  (a) At some point before October 20, 2001, an electronic component ("sequencer") that turned the original ten kilowatt heating element for the Nordyne heat pump on and off failed in the on position while the fan inside the heat pump was off.  This heating element produced temperatures in excess of 450 degrees Fahrenheit (the ignition temperature of the exterior siding for the portable) in the supply air duct which was in direct contact with the combustible exterior siding for the portable and which ignited the combustible exterior siding; (b) At the time of the fire, the ten kilowatt heating element installed by the School District in 1996 was not in operation; (c) If the Nordyne heat pump had been properly designed, the sequencer that failed would not have done so such that the original heating element continued to operate.  Rather, if properly designed, when the sequencer failed, the heating element would have been automatically

Findings of Fact and Conclusions of Law - 10

de-energized; and (d) The Nordyne heat pump had been improperly installed by NBS without a one inch clearance between the heat pump and the combustible exterior siding in violation of Nordyne's installation instructions, the Uniform Mechanical Code and the National Electrical Code.  This lack of a one inch clearance was a cause of the fire.

Mr. Kilgore's testing conditions, however, were dissimilar to the conditions at the Indian Trail Elementary School.  The exemplar provided and tested by Mr. Kilgore did not contain a roof structure. Heat was thus allowed to escape or dissipate into the open air upon testing.  Under these circumstances, and for other reasons, the Court finds Mr. Kilgore's testimony regarding the one inch clearance not persuasive and subject to considerable concern.

The Court finds Mr. Kilgore's opinions and testimony not persuasive or credible in light of all of the evidence in this case.

51.  The initial inspection of the Indian Trail heat pump and sequencer was carried out by Mr. Kilgore in conjunction with Randolph Harris and in accordance with an inspection protocol established by Mr. Kilgore.  That protocol provided for an X-ray of the sequencer.

52.  The two experts agreed that the heat pump's sequencer would have to be x-rayed.

53.  Initial electrical resistence measurements by both experts showed the sequencer was normal.

54.  Mr. Kilgore retained possession of the sequencer and agreed to contact Mr. Harris when the x-ray procedure was scheduled.  Mr. Kilgore never contacted Mr. Harris, but rather, independently examined

Findings of Fact and Conclusions of Law - 11

the sequencer which ultimately resulted in the sequencer's destruction.  As a result, Mr. Harris was unable to x-ray the sequencer and was not able to perform any further testing of the sequencer.

55.  With regard to Nordyne's motion in limine as to the exclusion of evidence regarding an alleged defect in the heat pump sequencer due to the spoliation of the evidence, the Court denies the motion and permits such evidence.  However, as noted above, the Court finds that Mr. Kilgore's testimony in its entirety, including evidence related to sequencer failure, is not persuasive.

56.  At trial, Plaintiff proffered the testimony of Mr. Kilgore regarding measurements of the opening into the classroom evidencing, in Mr. Kilgore's opinion, a lack of clearance between the supply air duct and the combustible exterior siding.  The Court will allow the proffer to stand, but, as indicated above, finds Mr. Kilgore's overall testimony unpersuasive when viewed in consideration of all of the evidence in this case.

57.  The Court finds Mr. Harris' testimony that the sequencer appeared intact, unchanged and not loose upon initial examination to be persuasive and credible.

58.  Mr. Harris opined that the cause of the fire at the Indian Trail Elementary School was the 1996 modification to the heat pumps by the School District.

59.  Mr. Harris indicated that adding 10 KW to the heat pump voided the Nordyne heat pump's UL rating and caused the high limit switch to repeatedly cycle during normal operation.  The high limit

Findings of Fact and Conclusions of Law - 12

switch should not function in a normal setting; therefore, the 1996 modification caused the Nordyne heat pumps to be in a continuous state of malfunction. The normal life expectancy of the high limit switch was reduced and eventually failed. Once the high limit switch failed, the temperatures in the hot air supply duct increased to a level far in excess of temperatures attained during normal operation.

60. Mr. Harris stated that, if there was a failure of the sequencer in the on position and a failure of the high limit switch, the ignition of the fire would have occurred whether or not the clearance had been one inch.

61. The Court finds the testimony of Mr. Harris regarding the cause of the fire at the Indian Trail Elementary School credible and persuasive.

62. On June 7, 2002, a fire substantially damaged a portable located at Pratt Elementary School, 6903 East 4th Avenue, Spokane, Washington, 99212.

63. Mr. Butterfield had an opportunity to examine the fire scene and concluded that the fire at the Pratt Elementary School was a mirror image of the fire at the Indian Trail Elementary School in October, 2001.

64. The fire at Pratt Elementary was caused by a Nordyne heat pump, delivered in 1992, igniting the combustible exterior siding of the portable.

65. When the heating portion of the Nordyne heat pump at Pratt was closely examined, it was discovered that the additional 10 KW heat bank added by the School District to the Nordyne heat pump had been

Findings of Fact and Conclusions of Law - 13

miswired causing the sequencer and high limit switch to malfunction and the Nordyne heat pump to operate in the on position continuously.

66.  The wiring error was attributed to work done by electricians employed by Spokane Public Schools.  It is undisputed that the Pratt Elementary fire was caused by the negligence of the School District.

67.  In the course of examinations conducted by NBS of the portable at the Indian Trail Elementary School, as well as other portables manufactured by NBS in 1992, it was revealed that plenums and duct work had been dented and bent and half-inch sheetrock, not installed by NBS, had been added to the portable around the air intake duct.  These facts evidence that the entire HVAC system had, at some point, been removed from the wall of the portable and then reattached subsequent to leaving the NBS factory.

68.  As a result of the two fires at Indian Trail and Pratt Elementary Schools, Spokane Public Schools undertook a retrofit effort in the summer of 2002.  This retrofit effort modified the manner in which heat pumps delivered with portables manufactured by NBS in 1992 were attached to the exterior siding of these portables.

69.  The 10 KW heating elements installed for the Nordyne heat pumps in 1996 were removed, and new 10 KW heating elements were installed directly in the supply air ducts inside the portables (duct heaters) augmenting the 10 KW heating elements that originally came with the Nordyne heat pumps.  However, at the Indian Trails Elementary School, the replacement portable had an entirely different stand alone heating and air conditioning system installed.

///

Findings of Fact and Conclusions of Law - 14

70.    Examination of the portables following the retrofit reveals that a one inch clearance is still not provided between the heating element portion of the heat pump and combustible materials for the first three feet of the supply duct on many of the portables following the retrofit.

71.    It cost Spokane Public Schools $178,324.64 to repair the fire damage to portable B-102 at Indian Trail Elementary School caused by the fire on October 20, 2001.  Hartford reimbursed Spokane Public Schools the sum of $164,316.37 for this damage.

72.    It cost the Spokane Public Schools $159,612.92 to modify all of the portables delivered by NBS in 1992 with Nordyne heat pumps.

73.    Many of the repairs and damages sought by Plaintiff are for a betterment of the HVAC system and would not have been recoverable had this Court ruled in favor of the Plaintiff in this case.

<u>Conclusions of Law</u>

**A.    Duty To Warn/Nordyne**

Spokane Public Schools is pursuing a claim for damages against Nordyne in this lawsuit based on the following two theories of recovery:  (1) defective design/failure to warn under the Washington Product Liability Act; and (2) violation of the Washington CPA.

Plaintiff's first claim against Nordyne is for its alleged failure to warn under the Washington Product Liability Act.  (Ct. Rec. 1).  A plaintiff establishes that a product is not reasonably safe by showing that "at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, rendered the warnings or instructions of

the manufacturer inadequate and the manufacturer could have provided the warnings or instructions which . . . would have been adequate." RCW 7.72.030(1)(b).

To establish a successful claim under RCW 7.72.030(1)(b), Spokane Public Schools must demonstrate that Nordyne's failure to warn of a possible danger associated with the heat pump was a proximate cause of its damages. *Hiner v. Bridgestone/Firestone, Inc.,* 138 Wn. 2d 248, 256, 978 P. 2d 505 (1999); *Ayers v. Johnson & Johnson Baby Prods. Co.*, 117 Wn.2d 747, 754, 818 P.2d 1337(1991).

Plaintiff contends that Nordyne, the manufacturer, of the heat pump, a relevant product for purposes of the Washington Product Liability Act, provided a heat pump which was not reasonably safe because adequate warnings or instructions were not provided to NBS, the installer of the Nordyne heat pumps. Plaintiff claims that Nordyne violated the requirements of the Uniform Mechanical Code by supplying a heat pump for installation which did not possess a label affixed to the exterior housing specifically identifying the proper clearance between the heat pump and combustible materials.

Regardless of the state of the label affixed to the exterior housing of the unit, it is undisputed that the Nordyne installation instructions provide for a one inch clearance between the air supply duct and surrounding combustible materials for the first three feet of the duct systems, and the evidence has demonstrated that said installation instructions were sent with the Nordyne units to Wesco. Although NBS has indicated that at the time it received the Nordyne heat pumps from its distributor (Wesco), the installation instructions

Findings of Fact and Conclusions of Law - 16

were not included, Nordyne cannot be held responsible for the intervening negligence of Wesco, a non-party.

If the original negligence of a defendant is followed by an unforeseeable independent intervening cause, force, or act of a third party that is the proximate cause of an injury or event, the chain of proximate causation is broken. *Qualls v. Golden Arrow Farms*, 47 Wn.2d 599 (1955). If the independent intervening cause, force, or act is not reasonably foreseeable, it is deemed to supercede the defendant's original negligence. The defendant's original negligence ceases to be the proximate cause. *Maltman v. Sauer*, 84 Wn.2d 975 (1975). Wesco's act of non-delivery of the installation instructions along with the unpackaged heat pumps to NBS was an unforeseeable negligent act that supersedes the alleged liability of Nordyne in failing to give adequate warnings or instructions regarding the need for a one inch clearance between the heat pump's air supply duct and the surrounding combustible materials.

Moreover, NBS constructed the portables in compliance with the specifications it was provided by Gelco Space's engineering staff in accordance with the Washington Gold Label design review process, not as dictated by the Nordyne installation instructions. NBS thus never relied on the Nordyne installation instructions. It was reasonable for Nordyne to assume that NBS would comply with their installation instructions. In addition, Nordyne was never informed that NBS did not receive installation instructions. At no time prior to installing the heat pumps did NBS contact either Wesco or the Nordyne technical service department to inquire about the whereabout of the Nordyne heat

Findings of Fact and Conclusions of Law - 17

pump installation instructions or to seek directives as to installation.

Based on the foregoing, Plaintiff cannot prevail against Nordyne on the theory of failure to warn under the Washington Product Liability Act.  The Court finds in favor of Defendant Nordyne and against Plaintiff Spokane Public Schools on Plaintiff's claim against Nordyne for the failure to warn under the Washington Product Liability Act.

**B.    Defective Design/Nordyne**

Plaintiff also maintains a claim against Nordyne for defective design under the Washington Product Liability Act.  In order to establish a claim for defective design under the Washington Product Liability Act, the plaintiff must show:  (1) a manufactured product (2) was not reasonably safe as designed and (3) caused harm to the plaintiff.  RCW 7.72.030(1)(a); *Bruns v. PACCAR, Inc.*, 77 Wn. App. 201, 208, 890 P.2d 469, *review denied*, 126 Wn.2d 1025 (1995).

Two alternative tests may be used to establish that a product was not reasonably safe as designed:  the risk-utility test and the consumer expectations test.  *Thongchoom v. Graco Children's Products, Inc.*, 117 Wn. App. 299, 304, 71 P.3d 214 (2003).  Under the risk-utility test, liability can be established by showing that, "at time of manufacture, the likelihood that the product would cause the plaintiff's harm or similar harms, and the seriousness of those harms, outweighed the manufacturer's burden to design a product that would have prevented those harms and any adverse effect a practical, feasible alternative would have on the product's usefulness."  *Lecy v.*

Findings of Fact and Conclusions of Law - 18

*Bayliner Marine Corp.*, 94 Wn. App. 949, 959-60, 973 P.2d 1110 (1999)

(*quoting Soproni v. Polygon Apartment Partners*, 137 Wn.2d 319, 326,

971 P.2d 500 (1999), *review denied*, 139 Wn. 2d 1025 (2000)).

Plaintiff asserts that Nordyne, the manufacturer of the heat

pump, a relevant product for purposes of the Washington Product

Liability Act, defectively designed their heat pump which caused

Plaintiff's injuries.  Specifically, Plaintiff argues that Mr.

Kilgore's testimony established a defective design, because the

electrical control circuitry for the heat pump did not foresee a

partial failure of the sequencer where only one of the two contacts

for the sequencer inadvertently closed.  If both contacts in the

sequencer failed, the heating element for the heat pump would

automatically shut off.  However, if only one of the two contacts

inadvertently closed, the heating element would continue to operate

while the cooling fan was off.  This allowed the heating element to

generate temperatures in excess of the ignition temperatures of

combustibles the heat pump was directly in contact with.  According to

Mr. Kilgore, this caused the fire at the Indian Trail Elementary

School.

The evidence demonstrates that the Nordyne heat pump was a UL

listed product which indicates that the original product complied with

industry safety standards.  Plaintiff's witnesses, Mr. Kilgore and Mr.

Wolfrum, testified that the original heat pump violated no codes and

was only taken out of the UL listings after the School District

modified the product in 1996.  According to Mr. Wolfrum's testimony,

UL proves that a product fails safe.

Findings of Fact and Conclusions of Law - 19

With regard to Mr. Kilgore's expert testimony about the alleged sequencer failure, it is undisputed that when Mr. Kilgore received the sequencer, a year and a half after the fire, and initially inspected it in conjunction with Mr. Harris, they found nothing abnormal or faulty with the sequencer.  They found it to be in a condition where both contacts were open.  Then, a month later, Mr. Kilgore conducted further testing of the sequencer without notifying Mr. Harris.  Mr. Kilgore testified that when he handled the sequencer on this occasion it fell apart in his hands.[1]  However, prior to the destruction of the sequencer, Mr. Kilgore stated that he found a contact in the sequencer to be in a failed "closed" state that would support his conclusions about the cause of the fire.  The Court is not persuaded by Mr. Kilgore's opinions regarding the failure of the sequencer and finds his testimony not credible in light of all the evidence in this case.

Mr. Kilgore's testimony regarding the sequencer failure is further contradicted by Ms. Golden's testimony that the unit was "blowing cold air" the week just prior to the fire and then worked just fine (blowing heat) following work performed by the School District's maintenance workers.  Had the unit failed in the manner Mr. Kilgore described, the fan could not have been operating.

It is undisputed that the 1996 action of the School District in doubling the heating capacity of the heat pump exceeded the unit's UL tested heat safety level and thus voided the unit's UL rating.  The modifications by the School District in 1996 resulted in the ultimate

---

[1]During the initial testing of the sequencer, Mr. Harris testified that the sequencer appeared to be "solid," not brittle or fragile, not heat damaged, and in good shape.

Findings of Fact and Conclusions of Law - 20

failure of the high limit switch.  It is uncontested that had the high limit switch not failed, the overheating could not have occurred.  The School District's 1996 modification, which voided the Nordyne heat pump's UL listing, was unforeseeable and intervening.  The evidence does not demonstrate that the Nordyne heat pumps were unsafe in design prior to the School District's 1996 modification.  This is further demonstrated by the fact that the retrofit effort undertaken by the School District in the summer of 2002 essentially returned the Nordyne units to their original state.

The undersigned finds in favor of Defendant Nordyne and against Plaintiff Spokane Public Schools on Plaintiff's claim of unsafe design under the Washington Product Liability Act.

**C.   Defective Construction/NBS**

Spokane Public Schools has sued NBS under two theories of recovery: (1) defective construction under the Washington Product Liability Act; and (2) violation of the Washington CPA, RCW 19.86.020.

With regard to Plaintiff's defective construction claim under the Washington Product Liability Act**,** Plaintiff argues that both the uniform mechanical code and the national electrical code required that the heat pump for the portable at issue be installed by NBS with a clearance of one inch between the heating element portion of the heat pump and any combustible material.  Since NBS did not comply with the requirements of the uniform mechanical code and the national electrical code, Plaintiff argues that they are strictly liable for the fire at the Indian Trail Elementary School pursuant to RCW 7.72.030(2)(a).

Findings of Fact and Conclusions of Law - 21

To recover under a theory of strict liability, pursuant to RCW 7.72.030(2)(a), for a failure to manufacture a product that is reasonably safe in construction, a plaintiff must show that when the product left the control of the manufacturer, the product deviated in some material way from the design specifications or performance standards of the manufacturer, or deviated in some material way from otherwise identical units in the same product line.  RCW 7.72.030(2)(a).

Plaintiff asserts that the portable qualified as a "factory built commercial structure" for purposes of RCW 43.22.450.  Under RCW 43.22.450(7), a "commercial structure" is defined as "a structure designed or used for human habitation, or human occupancy for industrial, educational, assembly, professional or commercial purposes."  Commercial structures are subject to regulation under RCW 43.22.480(1):

> The Department [of Labor & Industries] shall adopt and enforce rules that protect the health, safety and property of the people of this state by assuring that all factory built housing or factory built commercial structures are structurally sound and that the plumbing, heating, electrical and other components thereof are reasonably safe.  The rules shall be reasonably consistent with recognized and accepted principles of safety and structural soundness, and in adopting the rules **the department shall consider, *so far as practicable*, the standards and specifications contained in the uniform building, plumbing and mechanical codes**, including the barrier free code and the Washington energy code as adopted by the state building code council pursuant to Chapter 19.27A RCW, **and the national electrical code**, including the state rules as adopted pursuant to chapter 19.28 RCW and published by the national fire protection association or, when applicable, the temporary worker building code adopted under RCW 70.114A.081.

RCW 43.22.480(1) (emphasis added).

Findings of Fact and Conclusions of Law - 22

NBS asserts that they were required to comply with only the "Washington Gold Label Standard," not the specifics of the uniform mechanical code or the national electrical code.  NBS has established that the Washington Gold Label standard is an adopted building code that governs the manufacturing process carried out by NBS and all other manufacturers of modular classrooms for use in the state of Washington.  WAC 296-150F.

The Washington Gold Label process consists of a phase-by-phase inspection of the manufactured portables to confirm compliance with specifications on file with the state of Washington.  Mr. Cooper explained the process for obtaining the Gold Label.  Plans and specifications for the construction of the units are submitted by the contractor (in this case, Gelco) to the state Department of Labor and Industries for approval.  Once approved, and only after approval, the manufacturing of the building, pursuant to those plans and specifications, can begin.  State inspectors examine each phase of the construction and certify whether the unit complies with the Gold Label standard.  After the building is completed, a final inspection takes place and, if the Washington Gold Label standard has been complied with, an inspector affixes a Gold Label seal to the unit.

RCW 43.22.480(1) indicates that the Department of Labor and Industries shall adopt rules concerning factory built commercial structures and in doing so shall consider the standards in the uniform building, plumbing, mechanical and electrical codes, "so far as practicable."  However, it has been demonstrated that the Washington Gold Label is the standard adopted by the Washington State Department

Findings of Fact and Conclusions of Law - 23

of Labor and Industries for use for the manufacturing of portables, and the design specifications that Gelco Space's engineering staff submitted to the state for design review called for NBS to act in accordance with the Washington Gold Label standard in the construction of the portables.  The Washington Gold Label standard does not contain a specific requirement for a one inch clearance at any given location within the unit.  Moreover, Ron Cooper stated that the design specifications that Gelco Space's engineering staff had submitted to the state for review showed a zero clearance for the heat pump, and Randolph Harris stated that, under normal operating conditions, no clearance is necessary between the heating portion of the heat pump and combustible materials.  Nevertheless, NBS used a three-eighths inch template to provide a three-eighth's inch clearance between the heating element portion of the heat pump and combustible materials in the 1992 portables.  Upon completion of the state's final inspection, the unit shipped to Plaintiff and put into use at the Indian Trail Elementary School passed inspection as being code compliant and had the Gold Label seal affixed to the building.  Accordingly, the evidence shows that NBS complied with the design specifications that Gelco Space's engineering staff had submitted to the state for design review.

Furthermore, if the original negligence of a defendant is followed by an unforeseeable independent intervening cause, force, or act of a third party that is the proximate cause of an injury or event, the chain of proximate causation is broken.  *Qualls v. Golden Arrow Farms*, 47 Wn.2d 599 (1955).  If the independent intervening

cause, force, or act is not reasonably foreseeable, it is deemed to supercede the defendant's original negligence.  The defendant's original negligence ceases to be the proximate cause.  *Maltman v. Sauer*, 84 Wn.2d 975 (1975).

The modifications of the portable's HVAC system performed by the School District in 1996, the "repairs" performed on the unit itself by the school district the week of the fire, and the denting of the plenum and installation of half-inch sheetrock, not installed or accomplished by NBS, all completed without further state or independent inspection, were unforeseeable negligent acts that supersedes any alleged liability of NBS for defective construction of the portable.  In addition, both Mr. Kilgore and Mr. Harris testified that, without all of the failures to the components of the heat pump itself, the temperature would not have risen to point of igniting a fire on the siding - - an additional unforeseen, intervening cause.

Based on the foregoing, the Court finds that NBS' construction of the portable at the Indian Trail Elementary School was not defective. The evidence demonstrates that the construction performed by NBS was in accordance with the Washington State Gold Label standards and passed inspection based on those standards.  Accordingly, the Court rules in favor of Defendant NBS and against Plaintiff Spokane Public Schools on Plaintiff's defective construction claim under the Washington Product Liability Act.

**D.    Washington CPA Violation**

The Washington Consumer Protection Act ("CPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or

Findings of Fact and Conclusions of Law - 25

practices in the conduct of any trade or commerce." RCW 19.86.020. To establish a CPA claim, the plaintiff must show: (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) that impacts the public interest, and (4) proximately causes injury, (5) to the plaintiff's business or property. *Guijosa v. Wal-Mart Stores, Inc.*, 144 Wn.2d 907, 917, 32 P.3d 250 (2001); *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 785-93, 719 P.2d 531 (1986).

To establish an unfair or deceptive practice, it is not necessary to prove intent to deceive. *Haner v. Quincy Farm Chems., Inc.*, 97 Wn.2d 753, 759, 649 P.2d 828 (1982).

Whether the public has an interest in any given action is to be determined by the trier of fact from several factors, depending upon the context in which the alleged acts were committed. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*,105 Wn.2d at 790-91. The factors include: "(1) Were the alleged acts committed in the course of defendant's business? (2) Did defendant advertise to the public in general? (3) Did defendant actively solicit this particular plaintiff, indicating potential solicitation of others? (4) Did plaintiff and defendant occupy unequal bargaining positions?" *Id.* None of these factors is dispositive. Nor is it necessary that all of these factors be present. The factors "represent indicia of an effect on public interest from which a trier of fact could reasonably find public interest impact." Id.

///

///

Findings of Fact and Conclusions of Law - 26

### 1.   NBS

With Regard to the CPA claim against NBS, Spokane Schools argues as follows:

> (1) NBS engaged in an unfair or deceptive act of practice by installing Nordyne heat pumps on 23 portables constructed for Spokane Schools in 1992 without first consulting Nordyne's installation instructions and knowing, from previous experience with a competitor's heat pumps, that the heat pump would need some sort of clearance from combustible materials; (2) The act or practice occurred in the conduct of NBS' trade or commerce because all of the acts complained of occurred in the construction of the portables by NBS; (3) The act or practice affected the public interest because NBS was building classrooms to house 621 students at 12 schools throughout the school district;(4) Plaintiff was injured in either its business or its property due to the cost to repair the fire damage at Indian Trail Elementary and to modify all of the portables delivered by NBS in 1992 with Nordyne heat pumps so that the heat pumps possessed a clearance of one inch between the heat pump and the combustible exterior siding; and (5) NBS' act or practice caused Plaintiff's injury as evidenced by Ron Kilgore's testing which confirmed that if the heat pump had been installed with a one inch clearance, the temperature at the interface between the heating pump and the exterior siding of the portable would not have been greater than 250 degrees Fahrenheit, well below the siding's ignition temperature of 450 degrees Fahrenheit.

(Ct. Rec. 64, p. 15).

NBS concedes that the second and fourth elements of the CPA have been met: "occurring in trade or commerce" and "injury to Plaintiff's property." However, NBS contests the other three elements. (Ct. Rec. 62 , pp. 47-49).

NBS asserts that the question with regard to unfair and deceptive acts is whether the action has the capacity to deceive a substantial portion of the purchasing public. *Luxon v. Caviezal*, 42 Wn. App. 261 (1985); *Sing v. John L. Scott, Inc.*, 134 Wn.2d 24, 30 (1997). "Factors to be considered in assessing potential public impact are whether the facts suggest a pattern or conduct, the potential for

Findings of Fact and Conclusions of Law - 27

repetition, and the likelihood that others will be affected." *Hangman Ridge*, 105 Wn.2d at 790.

NBS maintains it continues to be governed by the Washington Gold Label Standard in its installation methods. NBS persists that the Gold Label standard may require less than a one inch clearance between the heating element portion of a heat pump and any combustible material in its installation of heat pumps on portables. Therefore, contrary to NBS' arguments, it is apparent that the installation methods of NBS displays a pattern of conduct, with repetition to others and a potential for affecting others. Moreover, also present is the potential to deceive a substantial potion of the public.

Nevertheless, the main issue with regard to the CPA in this case is whether NBS has acted in an unfair or deceptive manner. The evidence indicates that NBS has not.

NBS did not prepare the plans and specifications for the construction of the portables. Gelco Space specified the design of the portables and submitted these plans to state of Washington for approval. The specifications submitted to NBS by Gelco Space, following approval by the state, called for NBS to comply with the Washington Gold Label in manufacturing the portables. The Washington Gold Label standard does not specifically require a one inch clearance between the heating element portion of a heat pump and any combustible material, and the industry custom for such clearances was one-quarter inch. NBS exceeded industry standards by providing a three-eighths inch clearance between the heating element portion of the Nordyne heat pumps and combustible materials. Upon completion of the portables in

Findings of Fact and Conclusions of Law - 28

question, the Washington State Department of Labor and Industries affixed a Gold Label seal to the unit at the Indian Trails Elementary School indicating that the portable was compliant with state standards.  It is significant to note that examination of the portables following the School District's retrofit reveals that a one inch clearance is still not provided between the heating element portion of the heat pumps and combustible materials for the first three feet of the supply duct on several of the portables.  The School District cannot maintain a claim of unfairness for NBS' 1992 installation of the heat pumps due to clearance issues when those same alleged clearances persist following their retrofit.  The evidence demonstrates that NBS was not unfair, their installation methods were not deceptive, they complied with the plans and specifications provided by Gelco Space's engineering staff (and approved by the state), and they performed work in accordance with the Washington Gold Label design review process.

Plaintiff's claim against NBS for a violation of the Washington state CPA, RCW 19.86.020, is without merit.  With regard to the CPA Claim, the undersigned finds in favor of Defendant NBS and against Plaintiff Spokane Public Schools.

**2.  Nordyne, Inc.**

Plaintiff claims that Nordyne violated the Washington CPA by supplying NBS with heat pumps that did not come with labels advising what the proper clearance should be between the heat pump and combustible materials.

///

Findings of Fact and Conclusions of Law - 29

Plaintiff argues that the Uniform Mechanical Code required that the heat pump supplied by Nordyne for installation on the portables manufactured by NBS and supplied to Spokane Public Schools possess a label affixed to the exterior housing specifically identifying the proper clearance between the heat pump and combustible materials.  The label on the heat pump supplied for installation on the portable that caught fire on October 20, 2001 at the Indian Trail Elementary had no visible information inserted on the label that was affixed to the heat pump.  In checking all other Nordyne heat pumps installed on all of the other portables supplied by NBS to Spokane Public Schools in 1992, it was discovered that none of the labels on these heat pumps possessed any visible clearance information as well.  Plaintiff therefore contends that the failure to warn or give adequate instructions for the need of the one inch clearance on the affixed label is an unfair and deceptive "act."

Nordyne indicates that implicit in the definition of "deceptive" is the understanding that the actor misrepresented something of material importance.  *Potter v. Wilbur-Ellis, Co.*, 62 Wash.App. 318, 327 (1991).  Failure to warn of inherent dangers in the use of a product is not a deceptive or unfair act unless the manufacturer or seller knows of the dangers and by failing to reveal them misrepresents the safety of the product.  *Hiner v. Bridgestone/Firestone, Inc.*, 91 Wash.App. 722, 730 (1998).

The evidence has shown that information regarding construction of a one inch clearance was contained in the heat pump's installation instructions which were shipped with the unit, and these installation

Findings of Fact and Conclusions of Law - 30

instructions were also provided to the Plaintiff School District.  It was reasonable for Nordyne to assume that the manufacturer would comply with their installation instructions.  However, the evidence demonstrates that NBS constructed the portables in compliance with the plans and specifications it was provided by Gelco Space's engineering staff and in accordance with the Washington Gold Label design review process.  NBS did not rely on Nordyne installation instructions.  Furthermore, Nordyne's installation instructions were provided to the Spokane Public Schools, thus Nordyne could not be viewed as misrepresenting anything and the purchasing public could not be viewed as deceived.  *Caviezel*, 42 Wash.App. at 261; *Potter*, 62 Wash.App. at 327.  Plaintiff has also failed to show that anyone relied on the affixed label for installation or warning.  Accordingly, Nordyne cannot be said to have committed an "unfair or deceptive" act for failure to warn or adequately instruct regarding the installation of its product.

The bottom line is that it is undisputed that the School District had the Nordyne unit installation instructions which explicitly called for installation with a one inch clearance.  Since it has been demonstrated that the School District had the installation instructions, they cannot claim that they were deceived.  Therefore, with regard to Plaintiff's Washington state CPA claim, RCW 19.86.020, the undersigned finds in favor of Defendant Nordyne and against Plaintiff Spokane Public Schools.

///

///

Findings of Fact and Conclusions of Law - 31

<u>Conclusion</u>

After a bench trial, the Court finds that Plaintiff Spokane Public Schools has failed to establish that Defendant Nordyne was liable under the Washington Product Liability Act for defective design or failure to warn, or that Defendant NBS was liable under the Washington Product Liability Act for defective construction. Plaintiff has additionally failed to show that either Defendant is liable pursuant to the Washington Consumer Protection Act. Consequently, this Court finds in favor of both Defendants and against Plaintiff on all claims and enters this verdict accordingly.

The District Court Executive shall forward copies of this Findings of Fact and Conclusions of Law to counsel and enter judgment in favor of Defendants and against Plaintiff on all claims.

DATED this    13th    day of March, 2006.


                         S/  Michael W. Leavitt
                         MICHAEL W. LEAVITT
                    UNITED STATES MAGISTRATE JUDGE